[No. B075140. Second Dist., Div. Three. Sept. 10, 1993.]

TEOGENES RODRIGUEZ PALAY, a Minor, etc., et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; COUNTY OF LOS ANGELES et al., Real Parties in Interest.

## COUNSEL

Seaman & Dempsey and Sandra Tyson for Petitioners.

No appearance for Respondent.

Garcia, Emmons & Maranga, William O. Garcia, Greines, Martin, Stein & Richland, Timothy T. Coates, Barry M. Wolf, Rushfeldt, Shelley & Drake, Jo-Ann Horn Maynard, Bonne, Bridges, Mueller, O'Keefe & Nichols and John H. Dodd for Real Parties in Interest.

## OPINION

**KITCHING, J.**—Plaintiff and petitioner Teogenes Rodriguez Palay, a minor, by and through his mother Inocente Palay, as guardian ad litem, and petitioner Inocente Palay, individually, seek a writ of mandate to compel respondent superior court to vacate an order made during the course of discovery requiring production of Inocente Palay's medical records relating to prenatal care at the Wilmington Community Free Clinic to defendants and real parties in interest County of Los Angeles (Harbor-UCLA Medical Center), St. Mary Medical Center, and Dr. Jonathan Lawrence (collectively referred to as Defendants).[1]

In filing his action, Child waived his right to assert the physician-patient privilege by putting his own physical condition and medical records at issue. While Child has waived, Mother asserts a right to claim privilege as to prenatal records. We find that Mother cannot assert a privilege based on two grounds: (1) public policy; and (2) an interpretation of the litigation-exception that recognizes that during pregnancy, a mother's prenatal records are shared by both the mother and the fetus.

Since Child's medical records are inseparable from those of Mother during the time he was *in utero,* we find Mother's prenatal records relating to Child are also discoverable. The trial court did not abuse its discretion in finding these records discoverable and ordering their production. However, the trial court shall review these records in camera, which will accommodate both Mother's right to privacy and Defendants' right to disclosure.

Accordingly, the petition is denied. The stay imposed by this court shall remain in effect until issuance of the remittitur.

### FACTUAL AND PROCEDURAL BACKGROUND

This petition involves a conflict between a litigant's right to discovery and a nonparty's right to invoke the physician-patient privilege. The matter arises from a medical malpractice action brought on behalf of a minor, by his mother, as guardian ad litem. The question confronting us is whether the prenatal medical records of a mother, a nonparty to the litigation, whose child has filed a medical malpractice action, are discoverable or subject to a claim of privilege and a concomitant right to privacy.

Child was born prematurely at Harbor-UCLA Medical Center (Harbor-UCLA) on November 23, 1988, with an atrial septal defect in his heart. He

---

[1]Hereinafter, we refer to Teogenes Palay as "Child" and Inocente Palay as "Mother."

was diagnosed as developmentally delayed, with signs of cyanosis, brain damage and a heart defect.[2] His heart condition was monitored for approximately 14 months by a pediatric cardiologist.

On April 3, 1990, when Child was 16 months old, he suffered seizures and was taken by paramedics to the St. Mary Medical Center in Long Beach. At the hospital he suffered respiratory failure and cardiac arrest. During a two-month hospitalization, he was treated for neurological, heart and feeding problems, and suffered several episodes of cardiac arrest resulting in brain damage. Child is currently nonresponsive and in a state of semicoma.

On April 16, 1992, Child, by and through Mother as guardian ad litem,[3] filed a medical malpractice action alleging, inter alia, that Harbor-UCLA and its attending physicians were negligent in failing to adequately diagnose and treat cardiac disease detected at birth, which was a contributing factor in his subsequent cardiac arrest and resulting brain damage.[4] Defendants answered and asserted, among other affirmative defenses, comparative negligence.

In preparation for trial, Defendants scheduled Mother's deposition and requested authorization for release of her medical records from Harbor-UCLA. In response, Mother asserted the physician-patient privilege, but granted a limited waiver for the purpose of providing Defendants access only to her records relating to labor and delivery.

---

[2]Cyanosis is a "condition in which the normal color of the skin is replaced by a bluish tinge. It indicates that there is not enough oxygen in the blood, . . . The lack of oxygen in the blood may result from an insufficient supply of air to the lungs, . . . Also, when the heart, due to weakness, cannot circulate the blood well enough through the lungs, the blood does not receive enough oxygen and cyanosis results. Some irregularities in the structure of the heart may cause some of the blood to bypass the lungs and thus miss its supply of oxygen, . . ." (1 Schmidt, Attorneys' Dictionary of Medicine and Word Finder (1993) p. 429.)

[3]On April 15, 1992, Mother was appointed guardian ad litem of Child, who was two and one-half years old at the time the complaint was filed.

[4]The complaint originally named the County of Los Angeles and Harbor-UCLA as defendants. However, counsel argued that St. Mary Medical Center and Dr. Jonathan Lawrence were later named as parties to the action because they negligently treated Child when he was brought to the hospital's emergency room with seizures.

According to the complaint, on or about September 9, 1991, Child was treated at Harbor-UCLA for meningitis. At that time, physicians discovered and diagnosed the severity of the infant's heart problem. On December 11, 1991, Child filed a claim for damages with Los Angeles County and alleged that "Harbor General Hospital staff failed to properly evaluate and treat complex congenital cardiac problem leading to cardiac arrest in April 1990—causal link not suspected until birth records were ordered and received in September 1991." The minor claimed that "[c]ounty physicians should have more thoroughly investigated etiology of congenital arrythmias and other cardiac problems." On or about January 23, 1992, the claim was denied as untimely.

At her deposition, Mother refused to answer questions regarding the prenatal care and treatment she received during her pregnancy with Child at Harbor-UCLA and the Wilmington Community Free Clinic (Wilmington Clinic), and asserted the physician-patient privilege. Counsel permitted inquiry into prenatal information contained in Child's medical records, but objected as to matters contained in Mother's medical records.[5] Mother did, however, testify that she had received prenatal care at a clinic in Wilmington, and clinic personnel sent her to Harbor-UCLA.

On or about February 12, 1993, Defendants served a subpoena on the Wilmington Clinic for production of Mother's medical records. The records to be produced were described as: ". . . any and all records, documents, medical reports, including doctors' entries, nurses' charts, progress reports, original x-ray films, x-ray reports, lab reports, case history, emergency room records, admitting sheets and special tests pertaining to the care and treatment, diagnosis, prognosis, condition, discharge, and statement of charges rendered affecting or relating to Inocente Palay regardless of date."[6]

On or about February 16, 1993, Child filed an ex parte application for an order, inter alia, to quash the deposition subpoena on the grounds that Mother's medical records were subject to her right to privacy and protected by the physician-patient privilege. In opposition, Defendants argued that privacy rights of third party nonlitigants were not absolute and were to be balanced against a good cause reason for discovery, to wit, the ability to prepare a defense. The court denied Child's application and ordered Mother's prenatal medical records from the Wilmington Clinic to be produced in camera.

On May 7, 1993, Child and Mother filed a petition for writ of mandate (B075140) and request for an immediate stay of the order requiring production of Mother's medical records to the court, and the subsequent in camera inspection of those documents.

On June 1, 1993, we issued an alternative writ and we heard oral argument on August 19, 1993.

---

[5]According to Harbor-UCLA records of Child's clinical history, Mother visited the Wilmington Clinic nine times, beginning when she was fourteen weeks pregnant. She underwent a series of tests, results of which included a borderline alpha fetoprotein (AFP) test taken at 16 weeks.

The AFP test, performed between the 16th and 20th week of gestation, is a prenatal screening for neural tube defects of the fetus. (*Simmons* v. *West Covina Medical Clinic* (1989) 212 Cal.App.3d 696, 700 [260 Cal.Rptr. 772].)

[6]The subpoena, as issued, requested information regarding all aspects of Mother's medical history, and to that extent, was overbroad. Subsequently, Defendants limited their request for production of Mother's medical records only for the period during which she was pregnant with Child. Therefore, the scope of the subpoena is not at issue.

## CONTENTIONS

Child and Mother contend that:

1. Mother's right to privacy and the physician-patient privilege prohibit disclosure of her prenatal medical records from the Wilmington Clinic;

2. the privilege was neither waived by Mother's legal status as guardian ad litem nor by any significant disclosure of information; and,

3. Mother's prenatal history and medical records are irrelevant to the issues raised in Child's malpractice action.

## DISCUSSION

A writ of mandate is the proper remedy to review discovery orders and procedures. (*Rudnick* v. *Superior Court* (1974) 11 Cal.3d 924, 928 [114 Cal.Rptr. 603, 523 P.2d 643]; *Carlson* v. *Superior Court* (1961) 56 Cal.2d 431, 435-436 [15 Cal.Rptr. 132, 364 P.2d 308].) We issued the alternative writ because this case involves a claim of privilege and the issue raised is one of first impression and of general importance to the trial court and the profession. (*Rudnick* v. *Superior Court, supra*, 11 Cal.3d at p. 928; *Slagle* v. *Superior Court* (1989) 211 Cal.App.3d 1309, 1312 [260 Cal.Rptr. 122].)

The question confronting us is whether a mother, as a nonlitigant to a medical malpractice action filed on behalf of her infant son, is able to assert a physician-patient privilege to prevent disclosure of her prenatal medical records. To answer, we consider issues of public policy, statutory issues of privilege, and constitutional issues of privacy.

1. *The Shared Medical History of Mother and Child During Gestation Is Discoverable.*

 a. *Physician-patient Privilege.*

We begin with the premise that there can be no discovery of materials which are privileged. (*Rudnick* v. *Superior Court, supra*, 11 Cal.3d at p. 929; *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 395 [15 Cal.Rptr. 90, 364 P.2d 266].) The evidentiary privileges are statutory and ". . . any party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action or to the

determination of any motion made in that action . . . ." (Code Civ. Proc., § 2017, subd. (a); Evid. Code, § 911; *Koshman v. Superior Court* (1980) 111 Cal.App.3d 294, 297 [168 Cal.Rptr. 558].)

█ Evidence Code section 994 provides, in part, that "[s]ubject to Section 912 and except as otherwise provided in this article, the patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and physician if the privilege is claimed by: [¶] (a) The holder of the privilege; . . ."[7] █ To the extent privilege applies, it bars discovery of even relevant information. (Code Civ. Proc., § 2017; *Rudnick v. Superior Court, supra,* 11 Cal.3d at p. 929; *Jones v. Superior Court* (1981) 119 Cal.App.3d 534, 544 [174 Cal.Rptr. 148].)

█ Defendants argue that Mother's claimed privilege against disclosure of her medical records is subject to three statutory exceptions. First, "[t]here is no privilege . . . as to a communication relevant to an issue concerning the condition of the patient if such issue has been tendered by . . . [t]he patient" (§ 996, subd. (a)); second, "[t]here is no privilege . . . as to a communication relevant to an issue concerning the condition of the patient in a proceeding to recover damages on account of the conduct of the patient if good cause for disclosure of the communication is shown" (§ 999); and third, "[t]here is no privilege . . . as to a communication relevant to an issue of breach, by the physician or by the patient, of a duty arising out of

---

[7]All statutory references are to the Evidence Code unless otherwise indicated.

Section 912 provides: "(a) Except as otherwise provided in this section, the right of any person to claim a privilege provided by . . . 994 (physician-patient privilege), . . . is waived with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege. [¶] (b) Where two or more persons are joint holders of a privilege provided by . . . Section 994 (physician-patient privilege), . . . a waiver of the right of a particular joint holder of the privilege to claim the privilege does not affect the right of another joint holder to claim the privilege. . . . [¶] (c) A disclosure that is itself privileged is not a waiver of any privilege. [¶] (d) A disclosure in confidence of a communication that is protected by a privilege provided by . . . 994 (physician-patient privilege), . . . is not a waiver of the privilege."

A confidential communication between a patient and a physician is "information, including information obtained by an examination of the patient, transmitted between a patient and his physician in the course of that relationship and in confidence . . . and includes a diagnosis made and the advice given by the physician in the course of that relationship." (§ 992.) "The communications . . . are presumptively confidential and the burden of proof is on the opponent . . . to establish otherwise. (§ 917.)" (*Koshman v. Superior Court, supra,* 111 Cal.App.3d at p. 297.)

the physician-patient relationship." (§ 1001.) Since we find Defendants' litigation-exception argument pursuant to section 996, subdivision (a) applicable to our analysis, we do not consider their remaining contentions.[8]

b. *Mother Cannot Assert the Physician-patient Privilege.*

In our case, the prenatal records are shared records that belong to both Child and Mother. Child waived his right to claim privilege when he brought this lawsuit. Mother, however, asserted that as joint holder of the privilege as to these records, Child's waiver of his right does not affect her claim. (§ 912, subd. (b).) Does Mother have a separate privilege to these records? Yes. Can she assert this privilege? No.

(1) *Public Policy*

Privileges were created for policy reasons for "it is considered more important to keep certain information confidential than it is to require disclosure of all information relevant to the issues in the lawsuit. For each privilege created, the Evidence Code defines a 'holder of the privilege.'" (Jefferson, Jefferson's Synopsis of Cal. Evidence Law (hereafter Jefferson) (Cont.Ed.Bar 1985) § 35.1, p. 575.)

The holder of the privilege is the principal person who is authorized to claim or waive the privilege. (Jefferson, *supra*, at § 37.1, p. 606; § 993.) "There are *three* alternative holders of the physician-patient privilege: (1) the patient, when he has no guardian or conservator; (2) a guardian or conservator of the patient when he has one; or (3) the executor or administrator of a deceased person's estate." (*Ibid.*; § 993.)

Under ordinary circumstances, it would be reasonable for Mother to be able to assert the privilege on behalf of Child. We question, however, the appropriateness of allowing her to invoke the privilege to prevent disclosure of the prenatal records, and basically a portion of Child's medical history, during this lawsuit, when their interests potentially conflict. (*In re Troy D.* (1989) 215 Cal.App.3d 889, 900 [263 Cal.Rptr. 869].) "The whole

---

[8]We also do not reach the issue of Mother's alleged waiver. The record reflects that Mother testified at deposition that she received prenatal care at Harbor-UCLA and the Wilmington Clinic and provided Defendants copies of Child's medical records from Harbor-UCLA, which included statements summarizing the prenatal treatment she received at Wilmington Clinic. She authorized a limited waiver of medical records regarding labor and delivery. Her counsel acknowledged that Child's birth was a part of Mother's history. Defendants argue that Mother's testimony, the statements of counsel, and the production of a significant portion of medical records regarding Child's birth constituted a waiver of her privilege, but on the incomplete record before us we are not prepared to make such a determination.

purpose of the [physician-patient] privilege is to preclude the humiliation of the patient that might follow disclosure of his ailments. When the patient himself discloses those ailments by bringing an action in which they are in issue, there is no longer any reason for the privilege." (*City & County of S.F.* v. *Superior Court* (1951) 37 Cal.2d 227, 232 [231 P.2d 26, 25 A.L.R.2d 1418].) The privilege is statutory and "encourage[s] the patient to be free in disclosing facts about his illness to enable the physician to treat the illness or maintain the patient's general health. [Citation.] 'The rules of privilege are designed to protect personal relationships and other interests where public policy deems them more important than the need for evidence.' [Citation.]" (*In re Troy D., supra,* 215 Cal.App.3d at p. 900.)

■ No legitimate public policy is served by allowing Mother to prevent disclosure of the prenatal records. Child has purposely disclosed his ailments by bringing this action. The privilege was not created to protect the interests of a person in Mother's position, and she has not convinced us to do so. She should not be able to invoke a claim when its effect would be to abrogate Child's legitimate interest in providing evidence to support his claim for compensation.

### (2) *Litigation-exception to the Law of Privilege*

■ Under section 996, "[a] patient tenders the issue of his physical health if he files an action for personal injuries but only as to information which relates to the claimed injuries." (*Slagel* v. *Superior Court, supra,* 211 Cal.App.3d at p. 1313; *Koshman* v. *Superior Court, supra,* 111 Cal.App.3d 294, 298.) Disclosure is compelled in cases where the patient's own action initiates the exposure. (*Ibid.*) "The patient-litigant exception precludes one who has placed in issue his physical condition from invoking the privilege on the ground that disclosure of his condition would cause him humiliation. ■ ■ ■ He cannot have his cake and eat it too." (*City & County of S.F.* v. *Superior Court, supra,* 37 Cal.2d at p. 232.)[9]

■ We analyze Mother's claim of privilege by recognizing the unique physical realities of pregnancy and childbirth. The record reflects that Child

---

[9]We first dispose of any contention that Mother's claim of the statutory privilege was eliminated by her status as Child's guardian ad litem, and the filing of his lawsuit. Under Code of Civil Procedure section 372, ". . . a minor must appear in litigation by a guardian or conservator of his estate or a guardian ad litem appointed by the court. The statute represents a recognition by the Legislature that whenever a minor is involved in litigation, his rights cannot be protected unless a guardian ad litem or a similar representative acts for him. The guardian ad litem is an officer of the court, and he has the right to control the lawsuit on the minor's behalf." (*De Los Santos* v. *Superior Court* (1980) 27 Cal.3d 677, 683 [166 Cal.Rptr. 172, 613 P.2d 233].) A guardian ad litem who appears for a minor in an action does not become a party to that action. (*Sarracino* v. *Superior Court* (1974) 13 Cal.3d 1, 13 [118 Cal.Rptr. 21, 529 P.2d 53].) Like an attorney, the guardian ad litem is both the minor's representative of record and a representative of the court. (*Ibid.*) Mother is not a party-litigant.

was only 16 months old when he was hospitalized. He filed this action and placed his own medical condition at issue. He seeks damages for the physicians' alleged failure to properly treat underlying cardiac disease *detected* at birth, and the alleged negligent emergency room treatment. Defendants are entitled to discover whether Child's current medical condition was a result of environmental, congenital or gestational causes; *in utero* trauma; or physicians' negligence.

When we have a child of this young age, filing a malpractice action, it is reasonable to conclude that the scope of the child's medical history includes the prenatal records which reflect his medical condition while *in utero*.

The relationship between medical histories of a mother and child was initially addressed and considered within the parameters of a discovery dispute in *Jones* v. *Superior Court, supra,* 119 Cal.App.3d 534, an action against several drug companies by a woman who claimed injury as a result of her mother's having ingested the drug diethylstilbestrol (DES) while pregnant with plaintiff. (*Id.* at p. 540.) While the *Jones* court found a waiver of the privilege, an issue we do not address, it also considered the issue of the inextricable relationship between a mother and her child during pregnancy in relation to medical records. (*Id.* at p. 546.)

Our Supreme Court has recognized that during pregnancy the mother and child are a unique physical unit, and the health and welfare of each is intertwined and inseparable from the other. In *Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064 [9 Cal.Rptr.2d 615, 831 P.2d 1197], a medical malpractice action, the court ruled that a mother could recover damages for emotional distress as a "direct victim" of her physician's negligence in injuring her baby during delivery. The obstetrician unsuccessfully argued that the scope of the duty he owed to the mother was limited to avoiding physical injury to her during prenatal care and treatment and labor. (*Id.* at p. 1075.) That duty, he argued, did not extend "to avoiding injury to her fetus and the emotional distress that would result from such an injury." (*Ibid.*) It was the physician's "unsupported assertion that [the mother] and [the child] were two separate patients, because his actions could physically injure one and not the other." (*Ibid.*)

In discussing the duty of care to the mother arising from their physician-patient relationship, the court considered the physical and emotional relationship between a woman and her fetus and observed: "To accept [the physician's] argument would require us to ignore the realities of pregnancy and childbirth. [The mother] established a physician-patient relationship with [the obstetrician] for medical care which was directed not only to her,

but also to her fetus. The end purpose of this medical care may fairly be said to have been to provide treatment consistent with the applicable standard of care in order to maximize the possibility that [the mother's] baby would be delivered in the condition in which he had been created and nurtured without avoidable injury to the baby or to [the mother]. [Citation.] Moreover, during pregnancy and delivery it is axiomatic that any treatment for [the baby] necessarily implicated [the mother's] participation since access to [the baby] could only be accomplished with [the mother's] consent and with impact to her body. [¶] In addition to the physical connection between a woman and her fetus, there is an emotional relationship as well. . . . [T]he mother's emotional well-being and the health of the child are inextricably intertwined." (2 Cal.4th at p. 1076.) This statement of law is not merely dictum, but is essential to the court's reasoning in finding that the mother could be a "direct victim" of such medical negligence, and to the legal result.

This inextricable intertwining of mother and child is crucial to our analysis. However, since no California court has addressed the specific discovery issue confronting us today, we look to other states for guidance. The courts in New York have precluded the mother from claiming the privilege in our precise situation.

In *Scharlack* v. *Richmond Memorial Hosp.* (1984) 102 A.D.2d 886 [477 N.Y.S.2d 184], a medical malpractice action brought on behalf of the infant plaintiff, by a mother as a "nominal representative," it was alleged that the physician's negligent rendering of postnatal care resulted in severe injuries to the child. (477 N.Y.S.2d at p. 186.) The mother refused to disclose her medical history and records, and those of her other children. (*Id.* at p. 187.) The court considered her claim of privilege and ruled: "In her capacity as the mother of the infant plaintiff, Mrs. Scharlack can be deemed to have waived the physician-patient privilege only with respect to the medical history and records pertaining to the period when the infant plaintiff was *in utero*, during which time there could be no severance of the infant's prenatal history from his mother's medical history [citations]." (*Id.* at p. 187.)

*Scharlack* is one in a line of New York cases that exempts the mother's prenatal records from the nonparty physician-patient privilege on this theory of "impossibility of severance." (See also *Lezell By Lezell* v. *State* (N.Y.Ct.Cl. 1989) 538 N.Y.S.2d 902; *Herbst By Herbst* v. *Bruhn* (1984) 106 A.D.2d 546 [483 N.Y.S.2d 363]; *Yetman* v. *St. Charles Hosp.* (1985) 112 A.D.2d 297 [491 N.Y.S.2d 742].) In these cases, however, the courts' application of this theory did not provide defendants access to unlimited disclosure of a mother's medical history.

In *In re New York County DES Litigation* (1991) 168 A.D.2d 44 [570 N.Y.S.2d 804, 805], defendants requested medical information from nonparty family members to establish that plaintiffs' claimed injuries were

genetic or hereditary in origin, rather than the result of *in utero* exposure to DES. The court granted defendants limited access to medical records and stated: "The courts of this state have been confronted by demands by defendants for the medical histories of plaintiffs' mothers in numerous medical malpractice cases brought after the mothers have given birth to brain damaged children. In these actions, the mothers of these infant plaintiffs asserted the physician-patient privilege on the grounds they were nonparties. The courts have repeatedly noted that a mother's medical records pertaining to the period when the infant was *in utero* are discoverable on the ground that there can be no severance of the infant's prenatal history from the mother's medical history." (*Ibid.*)

Similarly, in *Burgos* v. *Flower & Fifth Avenue Hospital* (1980) 108 Misc.2d 225 [437 N.Y.S.2d 218, 219], the court ordered disclosure of prenatal records and reasoned: "During [pregnancy] there could be no severance of a mother from child. Neither can we sever the infant's prenatal history from the mother's medical history during that period. As the infant's privilege has been waived we cannot allow the mother's privilege to be interposed to the defendants' right to all of the infant's medical history."

The medical histories of a mother and her child, while the infant was *in utero*, are inextricably related. The law, as applied in discovery disputes in medical malpractice actions, such as our case, must recognize that during pregnancy the mother and the fetus are one indivisible unit. The New York cases are instructive, pertinent to the issue before us, and persuasive. Therefore, we find that, under a theory of inseparability, during the period Mother was pregnant with Child, the privilege as to her prenatal medical records must yield to a logical interpretation of the patient-litigation exception, and the documents are discoverable.

However, "a party's need to know certain information will not overcome a nonparty's privilege under circumstances in which that privilege is otherwise properly invoked." (*Jones* v. *Superior Court, supra,* 119 Cal.App.3d at p. 548.) The scope of the physician-patient privilege is affected by constitutional principles. (*Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669, 678 [156 Cal.Rptr. 55].)

2. *Mother's Constitutional Right of Privacy Is Not Absolute.*

 Our right to privacy is guaranteed and protected by state and federal Constitutions. In *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 484 [14 L.Ed.2d 510, 514-515, 85 S.Ct. 1678], the United States Supreme Court stated: "[S]pecific guarantees in the Bill of Rights have penumbras formed

by emanations from those guarantees that help give them life and substance. [Citation.] Various guarantees create zones of privacy."

*Griswold* involved issues concerning the marital relationship, but the broad rationale of the decision concerned aspects of intimacy in interpersonal relations and communications. (*In re Lifschutz* (1970) 2 Cal.3d 415, 432 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1].) "[T]he open-ended quality of that decision's rationale evidences its far-reaching dimension." (*Ibid.*) "The breadth of the concept of privacy is illustrated by the wide variety of contexts in which the constitutional privacy analysis has been employed. [Citations.]" (*White* v. *Davis* (1975) 13 Cal.3d 757, 774, fn. 10 [120 Cal.Rptr. 94, 533 P.2d 222].) "[I]n *In re Lifschutz, supra,* 2 Cal.3d 415, 431-432, the California Supreme Court held that the confidentiality of the psychotherapeutic session falls within one such zone [of privacy]. Since that decision, the California Constitution has been amended to include among the inalienable rights of all people the right to pursue and obtain privacy (Cal. Const., art. I, § 1) . . . ." (*Jones* v. *Superior Court, supra,* 119 Cal.App.3d at p. 549.)

The drive behind the constitutional amendment was an acknowledgment that "[f]undamental to our privacy is the ability to control circulation of information." (*White* v. *Davis, supra,* 13 Cal.3d 757, 774, italics omitted.) "[F]undamental to the privacy of medical information 'is the ability to control [its] circulation. . . .' " (*Board of Medical Quality Assurance* v. *Gherardini, supra,* 93 Cal.App.3d at p. 678.) "To determine whether the amendment created a right of privacy intended to protect the medical records here in dispute, we must examine into the nature of the information sought." (*Ibid.*)

In *Board of Medical Quality Assurance* v. *Gherardini, supra,* a state licensing board attempted to obtain the medical-hospital records of several patients of a physician who was under investigation by the board for negligence. The court considered the nature of the records and stated: "A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected." (93 Cal.App.3d at p. 678.) "The matters disclosed to the physician arise in most sensitive areas often difficult to reveal even to the doctor. Their unauthorized disclosure can provoke more than just simple humiliation in a fragile personality. The reasonable expectation that such personal matters will remain with the physician are no less in a patient-physician relationship than between the patient and psychotherapist. The individual's right to privacy encompasses not only the state of his mind, but also his viscera, detailed complaints of physical ills, and their emotional

overtones. The state of a person's gastro-intestinal tract is as much entitled to privacy from unauthorized public or bureaucratic snooping as is that person's bank account, the contents of his library or his membership in the NAACP. We conclude the specie of privacy here sought to be invaded falls squarely within the protected ambit, the expressed objectives of article I, section 1." (*Id.* at p. 679.)

"Surely no aspect of a woman's medical profile is more sensitive in terms of privacy interests than her obstetrical-gynecological history. It is precisely in the areas of marriage (*Loving* v. *Virginia* (1967) 388 U.S. 1, 12), procreation (*Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 541-542), sexual relations and contraception (*Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 453-454), family relationships (*Prince* v. *Massachusetts* (1944) 321 U.S. 158, 166), along with child rearing and education (*Pierce* v. *Society of Sisters* (1925) 268 U.S. 510, 535) that the United States Supreme Court has recognized a federally protected guarantee of personal privacy (see *Roe* v. *Wade* (1973) 410 U.S. 113, 153), and a concomitant privacy interest in 'the intimate medical problems of family, marriage, and motherhood' [citation]. Whether that intimacy is invaded through intrusion upon communications between the woman and her physician or more directly through demands upon the woman for disclosure of symptoms or conditions relating to her pregnancy would not appear to be critical for constitutional purposes. In other words, the right of privacy under federal and state Constitutions extends beyond the 'confidential communications' protected by statute." (*Jones* v. *Superior Court, supra,* 119 Cal.App.3d at pp. 549-550.)

The constitutional right to privacy is not absolute. (119 Cal.App.3d at p. 550; *Board of Medical Quality Assurance* v. *Gherardini, supra,* 93 Cal.App.3d at p. 679.) It may be outweighed by supervening concerns. (*Ibid.*) The state has enough of an interest in discovering the truth in legal proceedings, that it may compel disclosure of confidential material. (*Jones* v. *Superior Court, supra,* 119 Cal.App.3d at p. 550.) "[A]n individual's medical records may be relevant and material in the furtherance of this legitimate state purpose . . . ." (*Board of Medical Quality Assurance* v. *Gherardini, supra,* 93 Cal.App.3d at p. 679.) An "intrusion upon constitutionally protected areas of privacy requires a 'balancing of the juxtaposed rights, and the finding of a compelling state interest.' [Citations.]" (*Jones* v. *Superior Court, supra,* 119 Cal.App.3d at p. 550.)

In our case, Defendants have an interest in the medical records that are material in determining the cause of Child's medical condition and claimed neurological deficit, and any impact the prenatal period had on the alleged injuries. The history of events during pregnancy set forth in Mother's

prenatal records are a source of relevant information about the crucial period of the infant's gestation, and therefore a proper subject for inquiry. Defendants have no other means by which to obtain this information. Therefore, under the facts of this case, when we weigh Mother's privacy rights against Defendants' legitimate interest in preparing their defense, we find that Defendants' interest must prevail.

■■■ However, determination of the nature of the compelling state interest does not complete the constitutional equation. (*Wood* v. *Superior Court* (1985) 166 Cal.App.3d 1138, 1148 [212 Cal.Rptr. 811].) An impairment of the privacy interest "passes constitutional muster only if it is *necessary* to achieve the compelling interest." (*Ibid.*) "That means that the conflict between the competing values must be unavoidable, i.e., that it does not arise from the choice of means by which to secure the compelling interest. It can readily be seen that if the conflict is avoidable but is not avoided the real conflict is not between the compelling interest and the constitutional interest but between the *means* chosen to achieve the compelling interest and the constitutional interest. Thus, a logical corollary of the compelling interest doctrine is the alternatives test. It requires a reordering of the values to be placed on the constitutional scales. If an alternative means of securing the compelling interest can be devised by which to avoid or minimize the conflict between the values protected by the constitution and the values found to be of compelling interest, that must be done. [Citation.] This results in a prohibition, among other things, of overbroad means of enforcement. It requires that the state utilize the 'least intrusive' means to satisfy its interest. [Citation.]" (*Ibid.*; see also, *Board of Medical Quality Assurance* v. *Gherardini, supra,* 93 Cal.App.3d at p. 680.)

■■■ Defendants have no cognizable interest in medical records unrelated to Mother's pregnancy, nor should they. Discovery procedures must be utilized that identify and remove documents irrelevant and immaterial to the issue of prenatal care. The scope of methods used must be tailored to avoid disclosure of protected records. (See, e.g., *Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977]; *Wood* v. *Superior Court, supra,* 166 Cal.App.3d at pp. 1148-1150; *Willis* v. *Superior Court* (1980) 112 Cal.App.3d 277 [169 Cal.Rptr. 301].)

### CONCLUSION

The trial court ordered Mother to disclose prenatal records concerning Mother's medical treatment and Child's development during the gestation period. Mother cannot assert the physician-patient privilege as to these records because of Child's waiver of his right to claim the privilege and the

doctrine of inseparability. However, she retains the privilege as to her remaining medical history. The court was justified in ruling that the prenatal records were not privileged. We do not find an abuse of the court's discretion.

Mother's privacy rights in her medical history must be weighed against Defendants' right to prepare a defense. However, Defendants' right is limited to information in Mother's records specifically related to a determination of the issues in this litigation. The trial court's requirement that the records be reviewed in camera with the Mother and Child's counsel accommodates the competing considerations of confidentiality and disclosure. The court properly ordered this narrowly tailored discovery procedure. Through implementation of its order, the court can best determine if a protective order would also be appropriate in this case.

### DISPOSITION

Petition for writ of mandate is denied. The stay imposed by this court shall remain in effect until issuance of the remittitur.

Klein, P. J., and Croskey J., concurred.