Filed 6/19/15  P. v. Richardson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>GREGG ALLEN RICHARDSON,<br><br>    Defendant and Appellant. | C064678<br><br>(Super. Ct. No. CRF076688) |

Defendant Gregg Allen Richardson appeals his convictions for (1) assault with a deadly weapon or by means of force likely to inflict great bodily injury, with an allegation that he personally inflicted great bodily injury, (2) battery with serious bodily injury against Chad Humphries, with an allegation that defendant used a deadly weapon, and (3) possession of an unlawful weapon, a billy club.  He contends:  (1) there was insufficient evidence he was in possession of a "billy" within the meaning of Penal Code section 12020, subdivision (a)(1) (unless otherwise stated, statutory references that follow

1

are to the Penal Code); (2) his sentence for possession of a "billy" should have been stayed under section 654, because the possession was not independent from the assault with a deadly weapon and the battery; and (3) the trial court abused its discretion when it denied him access to the mental health records of the victim.

We affirm the judgment.

FACTS AND PROCEEDINGS

Early in the morning on November 10, 2007, Tiffany Henry and her common law husband, Chad Humphries, were driving her Chrysler from North Sacramento to a friend's house in West Sacramento. While on the freeway, the car's transmission began to malfunction. The car would slip out of gear, slow down to about 30 or 40 miles per hour at which point the transmission would re-engage and the car would accelerate. The longer they drove, the worse the problem became, with the car repeatedly slowing down and then accelerating. Because of the car's problems, they drove in the far right (slow) lane of the freeway.

As they were driving, Henry and Humphries noticed a large semi-truck driving close behind them with its high beams on. The truck passed them and pulled in front of them. As the truck passed, the driver looked at Henry. Henry testified that once defendant's truck was ahead of them, defendant slammed on the truck's brakes and Henry had to brake and swerve to avoid hitting the truck. Henry passed the truck and left the freeway. As they were waiting at a red light in the far left lane at the end of the ramp off the freeway, Henry and Humphries saw the truck had also left the freeway and was now next to them in the far right lane.

Henry and Humphries testified that defendant jumped down from the driver's seat of the truck, swinging a pipe with a leather strap attached to it. He ran toward the Chrysler and said, "It's on." Humphries and Henry got out of the Chrysler to explain their transmission problems. Henry told defendant to stop because she was ill and

2

Humphries was disabled. As Humphries was getting out of the car, he said to defendant, "Stop. What's your problem?"

Before Humphries was fully out of the car, defendant started beating him on the head with the metal bar. Defendant continued to beat Humphries about the head and body. Humphries tried to ward off the blows with his hands and Henry tried to pull defendant away from Humphries. When she could not, she got into the cab of his truck to try to release the air brakes and divert defendant's attention from Humphries. Defendant responded immediately by hitting her and pulling her out of the truck by her ankle.

At the time of the assault, officer Anthony Herrera was a police officer with the West Sacramento Police Department. Herrera was driving near the off-ramp when he saw the fight. As he got near the fight, he saw defendant hit Humphries six or seven times in the head and back with what appeared to be a pipe. Humphries was retreating as he was being hit. Herrera turned on his lights and siren and pulled up to the off-ramp. Humphries was standing, but hunched over, covering his bloody head with his hands. Humphries was unarmed and defendant had no injuries. Officer Ryan Lukins of the West Sacramento Police Department soon arrived at the place of the assault.

Herrera believed Humphries's life might be in danger, so he drew his weapon, identified himself as a law enforcement officer, and ordered defendant to stop. Defendant began to swing the pipe again, but stopped mid-swing. The officers told defendant to drop his weapon and get down on his knees. Defendant did not comply until after the third demand. Lukins ordered defendant to lie flat on the ground. When he did not comply, Herrera tackled him and forced him to the ground. The only visible injury to defendant came as a result of that tackle.

Defendant testified. He said when Humphries and Henry were stopped at the off-ramp, they were both yelling at him, as Humphries approached the truck. Defendant had been carjacked in 1992 and at that point, testified he was thinking, "this is where in 1992,

3

December, I was carjacked at knife point and got caught while I was inside my vehicle and it ended up being a knife fight and I was stuck inside the car defending myself." Defendant thought Henry and Humphries were going to try to carjack him. He was "getting nervous because I finally [made] a decision, my God, this is them. This is the same people that tried to jackknife me." Despite his fear, he testified, he initially got out of his truck without a weapon. But once he saw the driver's side door open, he was concerned for his safety so he "reached back and got my tire thumper." Defendant explained a "tire thumper" is a "stick you use that has a little bit of weight so when you do your pre-trip or post-trip and you conduct your inspection, you thump it to see if the tire pressure is correct or at least close to it." Most truckers use a tire thumper rather than a tire gauge, because it is faster.

Defendant testified Henry ran at him, screaming, and climbed into the cab of his truck. He tried to pull her out but she kicked him in the chest. Meanwhile, Humphries continued to approach, put defendant in a headlock and took him to the ground. Defendant got up and started swinging with the tire thumper. He hit Humphries in the head three times because Humphries kept coming at him. He did not hit Henry.

The object used to beat Humphries was a "heavy" metal pipe, with a hole drilled into one end to which a leather strap was fastened. The strap was used as a wristband, although defendant did not put it on his wrist during this incident. The pipe was produced at trial and entered into evidence. The metal pipe is 11 and one-half inches long and three inches round. (See attachment A.) Herrera recognized the object as a "tire thumper," an instrument commonly used by truckers to "thump" tires to check the air pressure.) Lukins identified the object as a metal pipe.

Defendant had hit Humphries in the head, ribs, and back. Humphries had defensive wounds on his hands. Paramedics and law enforcement personnel gave Humphries treatment at the site of the assault and, later an ambulance took Humphries to

4

the hospital. He received 16 staples to close his head wounds. At the time of trial, he still had scars on his scalp. He also had back pain and his ability to work was reduced.

About six months after the incident, Tom Bracamonte, an expert in transmission repairs, examined Henry's Chrysler. The car was in the same condition at that time as it had been on the night of the assault. Bracamonte found the overdrive wires were frayed, the transmission mount was in poor condition, there was a transmission fluid leak, and there was no coolant in the radiator. These conditions could have caused the car to jump in and out of overdrive, caused the car to decelerate or stall, or caused the transmission to drop out of gear.

An information charged defendant with assault with a deadly weapon or by means of force likely to inflict great bodily injury against Humphries (§ 245, subd. (a)(1)-- count 1), with an enhancement allegation that defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)), battery with serious bodily injury against Humphries (§ 243, subd. (f)(4)--count 2), with an enhancement allegation that defendant used a deadly weapon (§ 12022, subd. (b)(1)), assault with a deadly weapon or by means of force likely to inflict great bodily injury against Henry (§ 245, subd. (a)(1)--count 3), and possession of an unlawful weapon, a billy club (§ 12020, subd. (a)(1)--count 4). The jury found defendant guilty on counts 1, 2, and 4 and found the enhancement allegations true. The jury acquitted defendant on count 3.

The trial court sentenced defendant to three years on count 1 plus three years for the great bodily injury enhancement. On count 2, the court sentenced defendant to three years plus one year for the weapon enhancement but stayed the sentence pursuant to section 654. As to count 4, the court sentenced defendant to two years in prison to be served concurrently with the sentence on count 1.

5

I

*Sufficiency of the Evidence of Possession of a Billy*

Defendant contends the evidence was insufficient to prove that he was in possession of a "billy" pursuant to section 12020, subdivision (a)(1). Specifically, he argues there was no evidence presented that the tire thumper had the characteristics of a club or heavy stick or a short, thick cudgel or a baton, nor did any expert testify that the tire thumper fit within the rubric of a "billy."

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

We note that section 22210 now outlaws the possession of a billy. For ease of reference here, we will refer to the prior enactment, section 12020.

We quote the pertinent provisions of section 12020 as they were set forth in the statute at the time of this offense.

Section 12020, subdivision (a) provided, in pertinent part: "Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison: [¶] (1) . . . possesses . . . [an] instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sap, or sandbag." The section does not outlaw the possession of any precise objects but rather outlaws the possession of a broad range of instruments or weapons used for clubbing. (See *People v. Fannin* (2001) 91 Cal.App.4th 1399, 1401-1402, 1405; see also *People v. Barrios* (1992) 7 Cal.App.4th 501, 505.) Although the term "billy" is not defined in

6

section 12020, subdivision (a), our Supreme Court addressed the subject of a billy in *People v. Grubb* (1965) 63 Cal.2d 614, 621 (*Grubb*). In *Grubb*, the defendant was found to possess a small baseball bat in his car. The last few inches of the bat were broken off at the handle and the handle was taped. Defendant was convicted of possession of a billy in violation of section 12020.

On appeal, defendant claimed the statute was unconstitutionally vague in that it failed to sufficiently describe what the statute outlawed, that is, what constituted a "billy." Our state high court upheld the constitutionality of the statute.

Through this statute "the Legislature obviously sought to condemn weapons common to the criminal's arsenal; it meant as well 'to outlaw instruments which are ordinarily used for criminal and unlawful purposes.' [Citations.] The Legislature's understandable concern with the promiscuous possession of objects dangerous to the lives of members of the public finds manifestation in section 12020. Easy access to instruments of violence may very well increase the risk of violence. Hence we must, if possible, sustain the constitutionality of a statute designed for the salutary purpose of checking the possession of objects subject to dangerous use. [¶]

" . . . The Legislature here sought to outlaw the classic instruments of violence and their homemade equivalents; the Legislature sought likewise to outlaw possession of the sometimes-useful object when the attendant circumstances, including the time, place, destination of the possessor, the alteration of the object from standard form, and other relevant facts indicated that the possessor would use the object for a dangerous, not harmless, purpose. [Citation.]

"Thus we hold that the statute embraces instruments other than those specially created or manufactured for criminal purposes; it specifically includes those objects 'of the *kind* commonly known as a billy.' (Pen. Code, § 12020; italics added.) The concomitant circumstances may well proclaim the danger of even the innocent-appearing utensil. The Legislature thus decrees as criminal the possession of ordinarily harmless

7

objects when the circumstances of possession demonstrate an immediate atmosphere of danger.  Accordingly the statute would encompass the possession of a table leg, in one sense an obviously useful item, when it is detached from the table and carried at night in a 'tough' neighborhood to the scene of a riot.  On the other hand the section would not penalize the Little Leaguer at bat in a baseball game." (*Grubb*, *supra*, at pp. 620-621.)

Consistent with the holding of *Grubb,* the trial court instructed the jury, "A billy is a club or heavy stick.  A sometimes useful object can be considered a billy when the attendant circumstances, including the time, place, destination of the possessor, the alteration of the object from standard form, and other relevant facts indicate that the possessor would use the object for a dangerous, not harmless, purpose."

In *People v. Davis* (2013) 214 Cal.App.4th 1322 (*Davis*) defendant carried a bat with a number of holes drilled partially through the handle and a leather wrist strap in the back seat of his pickup truck.  Although defendant and his friends testified that defendant used the bat to play with his dog, defendant also testified that he supplemented his income repossessing automobiles and that it was a "security blanket" that he kept available in case he was threatened during a repossession.

The Court of Appeal held that under those facts and the applicable law "the jury could reasonably find the bat was a billy for purposes of section 12020." (*Davis*, *supra*, at p. 1328.)

So too here.  The weapon in this case is a piece of pipe with a hole drilled in it through which a leather strap is attached.  The pipe is approximately 11 and one-half inches long, three inches around and three and one-half inches around at the end.  Pipe of a larger diameter than the handle is threaded onto one end of the pipe.  At one end the inside of the pipe is smooth, at the other it is threaded.  (See attachment A.)

While we recognize the object here at issue could be used for an innocent purpose, that is, as a tire thumper, given all the attendant circumstances, the pipe also could be used equally as a weapon, specifically, a billy, as indeed it was used on this occasion.

8

The jury could conclude, as it did here, the object was a billy even though it could also be used for a harmless purpose.

We note that defendant testified that he kept the pipe handy in the event that he was carjacked, as he had been some 15 years before this incident, thus admitting that he carried it, at least in part, for use as a weapon. Tellingly, that was exactly the use he put it to during the assault on Humphries.

We also note that as defendant got out of his truck to confront Henry and Humphries he immediately grabbed for the object to carry with him into the altercation, certainly suggesting that he intended to use the item as a weapon whenever a weapon was needed.

We are of the opinion the jury could reasonably conclude the pipe may have been an ordinarily harmless object when used as a tire thumper but that the "circumstances of possession [here] demonstrate[d] an immediate atmosphere of danger." (*Grubb*, *supra*, at p. 621.) The jury could further have concluded that the relevant facts indicated the defendant planned to use the object as a weapon, that is, for dangerous, as opposed to harmless, purposes.

The evidence was sufficient to convict defendant of a violation of section 12020, subdivision (a)(1).

II

*Section 654*

Defendant contends the sentence for possession of the billy should have been stayed pursuant to section 654, since the possession was not independent of the commission of assault with a deadly weapon and the battery with infliction of serious bodily injury.

Section 654, subdivision (a) provides, in pertinent part, "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the

9

provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." Section 654 is intended "to insure that a defendant's punishment will be commensurate with his [or her] culpability." (*People v. Perez* (1979) 23 Cal.3d 545, 552.) The statute bars multiple punishment for both a single act that violates more than one criminal statute and multiple acts, where those acts comprise an indivisible course of conduct incident to a single criminal objective and intent. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208; *Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334, 338.)

Conversely, where a defendant commits multiple criminal offenses during a single course of conduct, he or she may be separately punished for each offense that he or she committed pursuant to a separate intent and objective. (*People v. Beamon* (1973) 8 Cal.3d 625, 637-639.) Multiple criminal objectives may "be a predicate for multiple punishment only in circumstances that involve, or arguably involve, multiple acts. The rule does not apply where . . . the multiple convictions at issue were indisputably based upon a single act." (*People v. Mesa* (2012) 54 Cal.4th 191, 199.) Whether multiple convictions were part of an indivisible transaction is primarily a question of fact for the trial court. (*People v. Coleman* (1989) 48 Cal.3d 112, 162; *People v. Avalos* (1996) 47 Cal.App.4th 1569, 1583.) Moreover, the purpose of section 654 is to ensure a defendant's punishment is commensurate with his culpability. (*People v. Saffle* (1992) 4 Cal.App.4th 434, 438.)

We review a challenge under section 654 for substantial evidence to support the trial court's determination. (*People v. Racy* (2007) 148 Cal.App.4th 1327, 1336-1337.) "Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the

10

respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

The parties correctly observe defendant had possession of the billy prior to the assault. We have concluded above that the evidence was sufficient for the jury to decide, as it did, that even though the object at issue could be used for a lawful purpose, defendant carried it also for use as a weapon if that use became necessary. The object was therefore an illegal billy throughout the time defendant possessed it. Given the uncontroverted fact that defendant possessed the billy in his truck for some unspecified time before the actual assault on Humphries, that possession occurred at a time prior to the billy's use as a weapon against Humphries. The trial court obviously and reasonably concluded that the object did not become a billy only once it was used in the assault at issue here. There is substantial evidence the possession of a billy was a separate criminal offense and the trial court did not err in refusing to stay the punishment under section 654.

## III

### *Mental Health Records*

Defendant's final contention is that the trial court abused its discretion in denying him access to the mental health records of Humphries. Defendant contends he had rebutted the statutory presumption of confidentiality and made a sufficient showing the records were relevant at trial. He also contends the trial court erred in failing to conduct an in camera review of the records.

During an interview with a Yolo County investigator, Tanya Souza, Humphries admitted he had mental health issues and was seeking treatment for them. Humphries specified he was a manic depressive, had extreme anxiety, and was bipolar. His disability rendered him unable to work. He also had a sleep disorder, lacked motivation,

11

and took longer to complete tasks due to a lack of understanding. Based on this information prior to trial, defense counsel moved to discover the medical and/or mental health records relating to Humphries for the prior 10 years. The People opposed the motion and the judge hearing the motion deferred resolution of the motion to the time of trial.

On the first day of trial, the trial judge ordered that Humphries's mental health records that the court had received would remain under seal.

After opening statements the jurors were excused from the courtroom and the court and counsel again addressed the question of the mental health records. At this point, the People moved to exclude any evidence of the victims' mental health conditions.

Defense counsel then referred to the statements Humphries made to Souza regarding his mental health. Defense counsel argued that the bizarre behavior defendant would describe could be explained by Humphries being "under the influence of a manic depressant [*sic*] state," and claimed "it explains the erratic driving, and it explains if we have two people that are manic at the same time, they have this mental condition, that someone who flashes the high beams at them, they go off and they act in this bizarre fashion."

Counsel continued that the records he sought might be relevant to show "what is the make up of the complaining witnesses in this case." He further contended the People could not "pass these guys off as just ordinary citizens when they are telling us, hey, we've got some mental issues." Defense counsel argued there was a jury instruction delineating issues to test credibility of a witness. Accordingly, he argued he should be able to examine how the manic depression affected the victims. Defense counsel also argued that, if the victims were on psychotropic medications, whether they were taking them or not taking them could affect their ability to perceive, recollect, and recall.

12

Finally, defense counsel took the position the information in the records was no longer privileged, as Humphries had revealed the information to the investigator thereby waiving the privilege.

The People replied Humphries had not waived the privilege and the information about his mental illness was not relevant to any issue in trial. The People asserted there was no causal connection made between manic depression or bipolar disorder as to the "makeup" of the victims, nor did the jury instruction on assessing credibility of witnesses address mental illness. The People noted defense counsel had been asked for an offer of proof as to relevance and could offer none. Moreover, manic depression is not a commonly understood term that would require expert testimony. In sum, the People argued the privilege had not been waived, the information about the victim's mental health was irrelevant and defendant had failed to show the compelling need required for disclosure or even an in camera inspection of the records.

The court held Humphries had not waived the psychotherapist-patient privilege. The court also found the material the defense sought was not relevant to the proceedings. The court ruled, however, that defendant could ask about types of medication, if any, the victims were taking the night of the incident, but could not discuss the diagnosis for which the medications were taken. On appeal, defendant argues that the trial court erred in deciding that Humphries had not waived the privilege and in deciding Humphries's mental health condition and records relating thereto were not relevant to the proceedings. He also argues that the trial court was, and this court is, obligated to review the records to determine whether they contain any information that would have been material to the proceedings.

In *Davis v. Alaska* (1974) 415 U.S. 308 [39 L.Ed.2d 347], the U.S. Supreme Court held that a criminal defendant's right to confront the witnesses against him sometimes requires witnesses to answer questions that call for information protected by state evidentiary privileges.

13

Even so, in California, the right of confrontation does not extend to the discovery of mental health records prior to trial. In *People v. Hammon* (1997) 15 Cal.4th 1117, 1123-1124 (*Hammon*) the Calfornia Supreme Court held the right of confrontation does not require the trial court, "at the pretrial stage of the proceedings, to review or grant discovery of privileged information in the hands of third party psychotherapy providers." (*Id.* at p. 1119.) Rejecting the contention that the Sixth Amendment grants the right to pretrial discovery of psychiatric information, the *Hammon* court held that there was no "adequate justification for taking such a long step in a direction the United States Supreme Court has not gone. Indeed, a persuasive reason exists not to do so. When a defendant proposes to impeach a critical prosecution witness with questions that call for privileged information, the trial court may be called upon, as in *Davis*, to balance the defendant's need for cross-examination and the state policies the privilege is intended to serve. [Citation.] Before trial, the court typically will not have sufficient information to conduct this inquiry; hence, if pretrial disclosure is permitted, a serious risk arises that privileged material will be disclosed unnecessarily." (*Hammon, supra*, at p. 1127; accord, *People v. Gurule* (2002) 28 Cal.4th 557, 592 (*Gurule*).)

Thus, defendant here had no right to Humphries's mental health records prior to trial.

Nonetheless, "the mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question." (*Gurule, supra*, at pp. 591-592.)

In the trial court, defendant failed to explain how any supposed mental illness suffered by Humphries adversely affected Humphries's ability to perceive, recall or describe the events of the evening of November 10, 2007. Indeed, defendant could offer nothing more than speculation and the trial court found that such speculation was insufficient. The trial court did not err in its ruling.

14

Defendant claimed both in the trial court and now on appeal that Humphries's statement to the investigator about his mental illness waived the psychotherapist-patient privilege.

The psychotherapist-patient privilege may be waived when the patient voluntarily discloses confidential information, or the patient tenders their mental state as an issue in the trial. "[B]ecause of the potential encroachment upon constitutionally protected rights of privacy by the compelled disclosure of confidential communications between the patient and his psychotherapist [citation], trial courts should carefully control compelled disclosures in this area. Thus, the psychotherapist-patient privilege is to be liberally construed in favor of the patient." (*Roberts v. Superior Court* (1973) 9 Cal.3d 330, 337 (*Roberts*).) The waiver of the psychotherapist-patient privilege "must be a voluntary and knowing act done with sufficient awareness of the relevant circumstances and likely consequences." (*Id.* at p. 343.)

The psychotherapist-patient privilege "may only be waived through a clear manifestation of an intent to waive. (Evid. Code, § 912, subd. (a); *Palay v. Superior Court* (1993) 18 Cal.App.4th 919, 926, fn. 7[].) Waiver occurs if the person holding the privilege, without coercion, discloses a significant portion of the communication or has consented to disclosure. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure. (Evid. Code, § 912, subd. (a).)" (*Los Angeles Gay & Lesbian Center v. Superior Court* (2011) 194 Cal.App.4th 288, 309.) Privileged communications may include the diagnosis, nature of the treatment received, and the content of communications. Neither admitting the existence of a psychotherapist-patient relationship nor disclosing the purpose of the psychiatric treatment discloses a significant portion of the communication as to other elements of the communication. (*In re Lifschutz* (1970) 2 Cal.3d 415, 429-430; *Roberts, supra,* 9 Cal.3d at p. 340.) "There is, of course, a vast difference between the disclosure of a general description of the object of . . . psychotherapeutic treatment, and the

15

disclosure of all or a part of the patient's actual communications during psychotherapy." (*Roberts, supra,* at p. 340.) Finally, even if the privilege is waived, "a patient retains the more general right to privacy protected by the state and federal Constitutions. [Citation.] Thus, any waiver must be narrowly construed and limited to matters 'as to which, based upon [the patient's] disclosures, it can reasonably be said [the patient] no longer retains a privacy interest.' " (*San Diego Trolley, Inc. v. Superior Court* (2001) 87 Cal.App.4th 1083, 1092.)

With these considerations in mind, we do not believe the statements by Humphries to the investigator disclosed "a significant portion of the communication" between him and his psychotherapist. All that was disclosed by Humphries was a diagnosis and some of the consequences of that illness. The disclosure did not include any of the contents of the communications between himself and his therapist, symptoms experienced or any treatment received. Moreover, there was no indication Humphries disclosed this information to the investigator with any awareness that he was waiving a privilege or with any understanding of the likely consequences of such a waiver. In fact, when faced directly with the question of whether he would knowingly waive the privilege, Humphries refused to do so. The trial court correctly found Humphries had not waived his privilege as to the contents of his mental health records.

Finally, relying on *Pennsylvania v. Ritchie* (1987) 480 U.S. 39 [94 L.Ed.2d 40] (*Ritchie*), defendant argues that the trial court had an obligation to review Humphries's mental health records, in camera, and its failure to do so was error.

First we note that defendant never made a request at trial for the trial court to review Humphries's mental health records in camera. But in any event, defendant's reliance on *Ritchie* is misplaced. While, under the circumstances in that case, the Court ordered an in camera review of the records at issue there, it certainly did not hold that a trial court is obligated to review such records, in camera, in every circumstance. Further, the *Ritchie* court observed that such a review was only necessary, if at all, after a

16

defendant first establishes a basis for his claim that the records contain material evidence. (*Ritchie*, *supra*, at p. 58, fn. 15.)  This, as we said above, defendant failed to do.  There was no error.

DISPOSITION

The judgment is affirmed.


       HULL        , J.


We concur:


      BLEASE     , Acting P. J.


      MAURO     , J.



Attachment A