[No. F020911. Fifth Dist. Oct. 13, 1994.]

MONIQUE LANTZ, Petitioner, v.
THE SUPERIOR COURT OF KERN COUNTY, Respondent;
COUNTY OF KERN et al., Real Parties in Interest.

## COUNSEL

Carol A. Sobel, Paul L. Hoffman and Silvia A. Argueta for Petitioner.

No appearance for Respondent.

B. C. Barmann, County Counsel, and James H. Thebeau, Deputy County Counsel, for Real Parties in Interest.

## OPINION

**ARDAIZ, P. J.**—Section 1985.3 of the Code of Civil Procedure provides a procedural mechanism designed to give notice to a "consumer" when the consumer's "personal records" are being subpoenaed by a "subpoenaing party." In this case, we conclude that when a county is a defendant in a civil

action alleging sexual harassment and seeks to subpoena personal records (here, medical records) of the plaintiff/consumer, the county is a "subpoenaing party" as that term is defined in subdivision (a)(3) of the statute and must therefore give notice to the consumer in the manner prescribed by the statute.

We also conclude the superior court erred in failing to apply the appropriate standard of review to petitioner's contention that California's constitutionally guaranteed right of privacy (Cal. Const., art. I, § 1) protected certain of her medical records from discovery by the county defendant.

## FACTS AND PROCEDURAL HISTORY

Petitioner Monique Lantz is the plaintiff in this civil action naming real parties County of Kern (the County), Kern County Sheriff's Department (the Department) and Sheriff Carl Sparks (Sparks) as defendants. Also named as a defendant is Donnie Youngblood, who is alleged to be a commander in the Department.[1] Petitioner's first amended complaint alleges that she was employed as a deputy sheriff with the Department, and that while so employed she was sexually harassed by Youngblood. The first amended complaint describes specific instances of harassment which are alleged to have occurred, and many of these involve alleged attention paid by Youngblood to petitioner's breasts.[2] Petitioner's first amended complaint also alleges that (1) after she filed a complaint with the Department of Fair

---

[1] The first amended complaint alleges that Youngblood was the agent of real parties Sparks, the Department and the County, and that Youngblood was at all times acting within the course and scope of that agency.

[2] Paragraph 14 of petitioner's first amended complaint alleges as follows: "14. The harassment was perpetrated by defendant Youngblood beginning in or about July of 1988 and continued through August of 1991. Examples of which include the following: [¶] (a) On many occasions during the Fall of 1988 defendant Youngblood would come into the substation, while plaintiff was working, and make sexual remarks about her body, focusing his attention on her breasts; [¶] (b) In or about October/November of 1988 defendant Youngblood while on duty, radioed for Ms. Lantz to meet him in a high school parking lot. He told Ms. Lantz that he had had a dream about her, in which he was having sex with her on the kitchen counter while holding onto her breasts; [¶] (c) During November of 1988 defendant Youngblood telephoned plaintiff at the Tehachapi substation where she was on duty and demanded that she come to his home to pick up some candy his wife had made. Plaintiff complied with defendant's request by going to defendant's home toward the end of her shift. Upon arriving at defendant's home, plaintiff was greeted by defendant in his underwear, sexually aroused, and with a pornographic film on the television; [¶] (d) During 1989, defendant Youngblood continued to make comments about plaintiff's appearance, her breasts and on one occasion in November of 1989, defendant Youngblood stopped plaintiff in her vehicle as she drove home from a funeral, and stated that plaintiff looked good, ogled her breasts, and commented that he liked the way my blouse fit; [¶] (f) [*sic*] At least once a month during 1990, defendant Youngblood would come into the substation to make personal phone calls while plaintiff was working, and stare at her body, usually directing his attention to her breasts[;] [¶] (g) In

Employment and Housing, Sparks retaliated against her by assigning her to job duties which would require her to contact Youngblood, (2) Sparks and the County negligently employed, retained and failed to supervise Youngblood, (3) Youngblood's actions were intentional and caused extreme mental anguish, (4) Youngblood's acts of sexual harassment intentionally disrupted petitioner's contractual employment relationship with the Department, and Sparks's "failure to adequately address the sexual conduct" likewise intentionally disrupted that contractual relationship, and (5) Youngblood defamed petitioner by telling her coworkers that she had "initiated sexually explicit discussions with other Sheriff Department employees."

Real parties are represented by the County Counsel for the County of Kern. On or about January 19, 1993, Katie S. Brandon, an office manager for Attorney's Messenger Service of Bakersfield, sent to petitioner's then-attorney, Carolyn D. Phillips, a letter stating:

"Dear Sir.

"Enclosed are the necessary legal documents to advise you that we are reproducing the records of: MONIQUE LANTZ on behalf of KERN COUNTY - COUNTY COUNSEL.

"If you would like a set for your files, please circle the desired location(s) and sign and return this letter within ten (10) days. If you do not comply, we will assume that copies for your office are not required.

"01. SCHMIDT, GERHARD H., GERHARD H. SCHMIDT. 3435 SAN DIMAS, BAKERSFIELD

"Sincerely, KATIE S. BRANDON" On or about February 18, 1993, Dr. Schmidt's records pertaining to petitioner were produced and copied without any objection by petitioner.[3]

---

August of 1990 defendant Youngblood changed plaintiff's Employee Performance Report from 'above standard' to 'standard'; [¶] (h) In late August of 1990 defendant Youngblood, went to plaintiff's house, and state [*sic*] that he hoped he would find plaintiff sunbathing; [¶] (i) During 1991 prior to plaintiff taking a leave of absence, defendant Youngblood continued to openly ogle plaintiff's body and breasts, made statements that he would be able to 'help' plaintiff when she was assigned to narcotics, and continued to make unnecessary visits to where plaintiff was working. Plaintiff was afraid that with her transfer to Bakersfield the harassment would heighten as she would once again be in close physical proximity to defendant Youngblood."

[3]Brandon's declaration, which the court expressly found to be truthful, did not state what, if anything, was enclosed with her January 19 letter. It is not disputed, however, that the records of Dr. Schmidt pertaining to petitioner were subpoenaed by the County.

Petitioner's deposition was taken on or about June 18, 1993. At that deposition petitioner was represented by Attorney Carolyn Sobel.[4] The portions of the deposition transcript presented to us by petitioner show that at the deposition real parties' attorney expressly mentioned that he was in possession of the records of Dr. Schmidt pertaining to petitioner. The deposition transcript also shows petitioner stated at that deposition that Dr. Schmidt had performed surgery on petitioner's breasts. Petitioner also gave the following deposition testimony to explain why she had been humiliated by Youngblood's alleged actions.

"A. Plus there was another reason I was humiliated.

"Q. What was the other reason?

"A. Can I tell my attorney something?

"Q. Sure. You can talk to your attorney any time you want.

"Okay. I had another question. What was the other reason you were humiliated?

"A. I'd rather not say.

"Q. Well, if it has any bearing on any of the issues in this lawsuit, Mrs. Lantz, you really don't have a right not to say—to tell me, unless it's something your attorney objects to, it's privileged, and there's a valid objection, but if there's a reason for—you know, it's connected to the issues in the allegations in this lawsuit, I'm entitled to know all about it.

"Ms. SOBEL: Can we take—

"MR. ROBINSON: You want to take a break?

"Ms. SOBEL: Yeah. Can we just take a break?

"Mr. Robinson:[5] Go ahead.

"(A recess was taken.)

---

[4]The record presented to us by petitioner contains nothing indicating when Attorney Phillips's representation of petitioner ended and when Attorney Sobel's representation of petitioner began. The first amended complaint bears Attorney Phillips's name and Fresno address. The motion which is the subject of this writ petition was filed after the aforementioned June 18, 1993, session of petitioner's deposition, and bears the name and Los Angeles address of Attorney Sobel.

[5]Mr. Robinson was the attorney representing defendant Youngblood.

"Ms. SOBEL: Okay. She's going to answer the question, but I want to put an objection on the record first. The hesitation in the witness to answer the question is because the response relates to a medical condition that is not related to this otherwise and that has never been disclosed previously in the course of this litigation. And she's prepared to answer it at this point, but by answering it we're not waiving any objections to any records that would relate to that condition.

"MR. ROBINSON: Okay, fine. I understand.

"Q. (By Mr. Robinson) Okay. Having heard your attorney's objection, Mrs. Lantz, my question is—you said there was another reason you were humiliated. What was that reason?

"A. Youngblood knew that I had had a mastectomy, double mastectomy, and I thought it was pretty insensitive for him to be talking about holding my big tits.

"Q. Okay. Now, have you finished your answer?

"A. Yeah."

On or about June 22, 1993, petitioner's attorney, Sobel, sent a letter to real parties' attorney in which Sobel demanded the return to her of the records obtained from Dr. Schmidt. The letter stated in part: "Because you have failed to comply with the requirements of Civil Procedure § 1995.3 [*sic*: 1985.3], under which notice and an opportunity to object to the subpoena of personal records is to be given to each consumer prior to production of the requested documents, we are demanding that you turn over to us immediately the original and all copies of all materials produced from the records maintained by Dr. Gerhardt Schmidt concerning Deputy Lantz. . . . If I do not receive a response from you by tomorrow morning and all of the documents in question, I will move for a protective order immediately." Real parties' attorney replied in a letter dated July 2, 1993, which stated in relevant part: "In regard to the subpena for Dr. Schmidt's records, it is our position that the County was not obligated to send a consumer notice pursuant to C.C.P. § 1985.3(a)(3). However, since the plaintiff received actual notice that Dr. Schmidt's records had been subpoenaed by a letter from Attorney's Messenger Service to Carolyn Phillips dated January 19, 1993 (a copy of the letter is attached), the plaintiff did not suffer prejudice from any lack of notice by the County. Further, there is no dispute that the plaintiff had actual notice that Dr. Schmidt's records were being subpoenaed. The plaintiff did not seek a protective order regarding these records

even though they contained information pertaining to the plaintiff's breast surgery. Therefore any claims based on privacy have been waived by your client. Lastly, you should read your client's initial harassment departmental complaint of sexual harassment in which the plaintiff devotes two paragraphs to the cause and impact of her breast surgery and its relationship to her allegations against Commander Youngblood. Your client has put the surgery in issue in this case by claiming a special vulnerability regarding her breasts. Given the evidence of plaintiff's propensity to flaunt her breasts, the truth of her assertions on this subject are in question."

The record presented to us on this petition contains no indication that Attorney Sobel replied to the July 2, 1993, letter. On or about July 26, 1993, petitioner filed in superior court a "motion for protective order and return of improperly subpoenaed medical records." The notice of motion stated that the motion sought "an order granting a protective order limiting discovery and directing the return of certain of plaintiff's medical records improperly obtained from the office of Dr. Gerhard Schmidt, and for an order directing defendant to pay a monetary sanction to plaintiff in the sum of $2,564.00 for the reasonable expenses and attorney fees necessarily incurred by the moving party in bringing this action."[6] The County opposed the motion.[7] The motion was heard by the court on or about August 12, 1993. The court took the matter under submission and subsequently issued the following ruling denying the motion:

"Re: Plaintiff's Motion for a Protective Order and Return of Records heretofore submitted,

"*Denied.*

"1. Information contained within the medical records is relevant.

"2. The declaration of Katie Brandon establishes that the County Counsel's Office effectively gave a 30 day notice of its intent to access plaintiff's medical records. This notice obviates any potential constitutional defects concerning C.C.P. § 1983.5 [*sic*: 1985.3], as raised by plaintiff's counsel.

---

[6]We have searched the motion in vain for any description or explanation of the "protective order limiting discovery" referred to in petitioner's notice of motion. So far as we can tell from the record presented to us, the only specific relief actually sought by the motion was an order directing respondents to return the Schmidt records. (See Cal. Rules of Court, rule 311(a).)

[7]Although defendants the County, the Department and Sparks have appeared as real parties in interest to oppose petitioner's petition for writ of mandate, the parties appear to agree that only defendant the County subpoenaed the Schmidt records. Only the County opposed petitioner's motion in the superior court.

"3. Plaintiff's failure to notice a timely motion to quash, and subsequent failure to bring this motion earlier than August 12 suggests a lack of confidence in the asserted privacy claim. Whatever the outcome might have been upon the hearing of a timely motion to quash and return, sufficient relevancy has now been established so as to cause this court to deny the Motion to Quash and to Return the Records. No sanctions."

Petitioner then filed in this court her petition for extraordinary relief. This court, after soliciting and receiving real parties' response to the petition, issued an order to show cause.[8]

### PETITIONER'S CONTENTIONS

Petitioner contends the superior court erred in denying her motion because the records of her treatment by Dr. Schmidt are protected from discovery by the right to privacy guaranteed by the California Constitution. She also contends the records were improperly subpoenaed from Dr. Schmidt in the first instance because respondents failed to comply with the notice requirements of section 1985.3 of the Code of Civil Procedure.[9] ■ As we shall explain, we agree with petitioner that the notice requirements of section 1985.3 were applicable here and should have been complied with. ■ We are also of the view that petitioner's right to privacy was not adequately protected by the superior court because that court utilized the wrong standard for determining whether the medical records are properly discoverable.

---

[8]At the outset we note that we would have had good reason to deny this writ petition summarily. It is petitioner's burden to provide this court with a record sufficient to permit review of the challenged ruling. To be adequate, such a record should include a reporter's transcript of the hearing on the motion which resulted in the ruling adverse to petitioner. (*Fuss v. Superior Court* (1991) 228 Cal.App.3d 556, 559 [279 Cal.Rptr. 46]; *Mahoney v. Superior Court* (1983) 142 Cal.App.3d 937, 939 [191 Cal.Rptr. 425]; *Francisco R. v. Superior Court* (1980) 114 Cal.App.3d 232, 238-239 [170 Cal.Rptr. 572]; *Pedlow v. Superior Court* (1980) 112 Cal.App.3d 368, 371 [169 Cal.Rptr. 326]; *Sherwood v. Superior Court* (1979) 24 Cal.3d 183, 186-187 [154 Cal.Rptr. 917, 593 P.2d 862]; *Lemelle v. Superior Court* (1978) 77 Cal.App.3d 148, 156-157 [143 Cal.Rptr. 450]; Cal. Rules of Court, rule 56(c); Cal. Civil Writ Practice (Cont.Ed.Bar 1987) ch. 7, § 7.48; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1993) §§ 15:188, 15:194-195; 8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs, § 160, pp. 797-798.) In this case, the petition was not originally accompanied by a transcript of the hearing or by any representation that such a transcript would be forthcoming. (See Cal. Rules of Court, rule 56(c)(4).) Because of our concern that the privacy rights of petitioner should be properly protected (see *Pacific Tel. & Tel. Co. v. Superior Court* (1970) 2 Cal.3d 161 [84 Cal.Rptr. 718, 465 P.2d 854]), we took the unusual step of inviting petitioner to supply the missing transcript. (*Sea Horse Ranch, Inc. v. Superior Court* (1994) 24 Cal.App.4th 446, 450 [30 Cal.Rptr.2d 681].) Petitioner did so.

[9]All statutory references hereafter are to the Code of Civil Procedure unless otherwise indicated.

## I.

### SECTION 1985.3

A. *Origin and Content of the Statute*

In 1974 an amendment to the California Constitution elevated the right of privacy to an "inalienable right." The following year the California Supreme Court held in *Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977], that before a bank could release confidential information to a civil litigant about a bank customer, the bank first had to take reasonable steps to notify the customer that the customer's records were being sought. The court stated: "Striking a balance between the competing considerations, we conclude that before confidential customer information may be disclosed in the course of civil discovery proceedings, the bank must take reasonable steps to notify its customer of the pendency and nature of the proceedings and to afford the customer a fair opportunity to assert his interests by objecting to disclosure, by seeking an appropriate protective order, or by instituting other legal proceedings to limit the scope or nature of the matters sought to be discovered." (*Valley Bank of Nevada* v. *Superior Court, supra*, 15 Cal.3d at p. 658.)

In 1980 the Legislature enacted section 1985.3. (See Stats. 1980, ch. 976, § 1, p. 3101.) The purpose of section 1985.3 was "to protect a consumer's right to privacy (Cal. Const., art. I, § 1) in his personal records maintained, or kept, by his attorney, accountant, doctor, banker, etc." (*Sasson* v. *Katash* (1983) 146 Cal.App.3d 119, 124 [194 Cal.Rptr. 46].) Under the statute, a "subpoenaing party" who seeks to obtain "personal records" pertaining to a "consumer" in connection with "any civil action or proceeding pursuant to this code" must take certain steps to attempt to notify the consumer that the consumer's personal records are being sought. Subdivision (b) of section 1985.3 provides that prior to the date called for in the subpoena for production of the records, "the subpoenaing party shall serve or cause to be served on the consumer whose records are being sought a copy of the subpoena duces tecum, of the affidavit supporting the issuance of the subpoena, and of the notice described in subdivision (e)." Subdivision (e) describes the three required elements of the notice (see also *Slagle* v. *Superior Court* (1989) 211 Cal.App.3d 1309, 1312 [260 Cal.Rptr. 122]) and points out that the notice may be served on the consumer's attorney if the consumer is represented by an attorney. The subdivision states: "(e) Every copy of the subpoena duces tecum and affidavit served on a consumer or his or her attorney in accordance with subdivision (b) shall be accompanied by a notice, in a typeface designed to call attention to the notice, indicating that (1) records about the

consumer are being sought from the witness named on the subpoena; (2) if the consumer objects to the witness furnishing the records to the party seeking the records, the consumer must file papers with the court prior to the date specified for production on the subpoena; and (3) if the party who is seeking the records will not agree in writing to cancel or limit the subpoena, an attorney should be consulted about the consumer's interest in protecting his or her rights to privacy. If a notice of taking of deposition is also served, that other notice may be set forth in a single document with the notice required by this subdivision." (§ 1985.3, subd. (e).)

The consumer may move to quash or modify the subpoena duces tecum. (§ 1985.3, subd. (g).) The witness in possession of the records is not required to produce them until the motion has been ruled upon or until there has been an "agreement of the parties, witnesses, and consumers affected." (*Ibid.*) If the consumer or the consumer's attorney executes a written authorization authorizing the witness to release the records and furnishes it to the witness, the witness may release the records. Otherwise, the subpoenaing party must also, prior to the production of the records, "serve or cause to be served upon the witness a proof of personal service or of service by mail attesting to compliance with subdivision (b)." (§ 1985.3, subd. (c)(1).) In other words, the subpoenaing party must serve the witness with a proof of service attesting that the consumer or the consumer's attorney has been served with a copy of the subpoena and with a subdivision (e) notice of privacy rights. (See also, Weil & Brown, Civil Procedure Before Trial (The Rutter Group 1994) ¶ 8:593.2 (rev. #1, 1988).) A failure to comply with the statute "shall be sufficient basis for the witness to refuse to produce the personal records sought by" the subpoena. (§ 1985.3, subd. (k).)

Section 1985.3 defines "consumer" to include "any individual" (here, petitioner Lantz). (Subd. (a)(2).) It defines "personal records" to include "the original or any copy of books, documents, or other writings pertaining to a consumer and which are maintained by any 'witness' which is a physician . . . ." (Subd. (a)(1).) Dr. Schmidt is a physician, and his records pertaining to petitioner are unquestionably "personal records." Petitioner and the County disagree, however, over whether a county can be a "subpoenaing party" as that term is defined in subdivision (a)(3).

B. *The County Is a "Subpoenaing Party"*

Petitioner contends the County is a "subpoenaing party" and failed to comply with the notice requirements of section 1985.3. The County concedes it did not give notice in the manner called for in the section, but contends that it was not required to do so because the County was not a

"subpoenaing party" as that term is defined in subdivision (a)(3) of the statute. The principles of statutory interpretation which guide us in our attempt to ascertain the meaning of subdivision (a)(3) of section 1985.3 were concisely stated in *People* v. *Pieters* (1991) 52 Cal.3d 894, 898-899 [276 Cal.Rptr. 918, 802 P.2d 420]: "The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. (*People* v. *Craft* (1986) 41 Cal.3d 554, 559 [224 Cal.Rptr. 626, 715 P.2d 585]; *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658 [147 Cal.Rptr. 359, 580 P.2d 1155].) In order to determine this intent, we begin by examining the language of the statute. (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; *Palos Verdes Faculty Assn., supra,* at p. 658.) ■ But '[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' (*Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 113 [145 Cal.Rptr. 674, 577 P.2d 1014], citations omitted, internal quotation marks omitted; . . .) Thus, '[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' (*Lungren* v. *Deukmejian, supra,* at p. 735.) Finally, we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814 [114 Cal.Rptr. 577, 523 P.2d 617].)"

■ We therefore begin by examining the language of section 1985.3, subdivision (a)(3) itself. It states: " 'Subpoenaing party' means the person or persons causing a subpoena duces tecum to be issued or served in connection with any civil action or proceeding pursuant to this code, but shall not include the state or local agencies described in Section 7465 of the Government Code . . . ."

Subdivision (f) of Government Code section 7465 states in relevant part that "[t]he term 'local agency' includes a county . . . ." The County argues that because a "county" is expressly included in the definition of "local agency" found in subdivision (f) of Government Code section 7465, the intent of section 1985.3, subdivision (c)(2) was to exempt counties from having to comply with the notice requirements of section 1985.3 when a county subpoenas the personal records of a consumer. Although we acknowledge that a literal reading of section 1985.3, subdivision (a)(2) would call for the construction of the statute advanced by the County, we are of the view that the Legislature had another meaning in mind when it used the

phrase "but shall not include the state or local agencies described in Section 7465 of the Government Code." (§ 1985.3, subd. (a)(3).)

Government Code section 7465 is part of the California Right to Financial Privacy Act. This act, enacted in 1976 (see Stats. 1976, ch. 1320, § 5, p. 5911, and Gov. Code, § 7460 et seq.), sets forth the mechanism by which a state or local agency conducting a civil or criminal investigation of a customer of a financial institution may attempt to subpoena the customer's financial records "in connection with a civil or criminal investigation of the customer, whether or not an investigation is being conducted pursuant to formal judicial or administrative proceedings." (Gov. Code, § 7471.) The Right to Financial Privacy Act preceded by four years the enactment of section 1985.3. Thus, when section 1985.3 was enacted, there was already in place a procedure by which the financial records of a financial institution's customer could be sought in connection with the judicial or administrative proceedings described in the Right to Financial Privacy Act. Government Code sections 7474 and 7476 (pertaining to administrative and judicial subpoenas, respectively) already provided that a customer be given notice his or her financial records were being sought and that he or she be given 10 days to move to quash a subpoena seeking those records. The language in section 1985.3, subdivision (a)(3), referring to Government Code section 7465, appears to us to have been an inartful attempt by the Legislature to exempt from section 1985.3 those judicial subpoenas which were already governed by the Right to Financial Privacy Act and for which no new legislation was needed.

Our review of the available legislative history of Assembly Bill No. 2948 (1979-1980 Reg. Sess.), the bill which was eventually enacted as section 1985.3, appears to support this interpretation of subdivision (a)(3). A California Franchise Tax Board's "bill analysis" of Assembly Bill No. 2948 stated in part:

"It is generally conceded that both judicial and administrative subpoenas duces tecum are subject to the California Right to Financial Privacy Act (Govt. Code Section 7460, et seq.), which deals with obtaining financial information from financial institutions concerning their customers.

"This bill is in conflict with the procedural requirements of that act which generally require allowing the customer 10 days notice of the subpoena so that he may move to quash, etc.

"This conflict can be avoided by simply excluding these provisions from application to that Act."

Furthermore, we have found nothing in our review of the available legislative history to suggest or imply that any other interpretation of section

1985.3, subdivision (a)(3) might have been intended. This is not surprising because the interpretation advanced here by the County would appear to be substantially at odds with what appears to be the very objective of the statute—to provide a codified procedure by which a consumer's privacy interest in his or her personal records could be protected. Under the County's interpretation, any county defendant in any personal injury case would be exempt from section 1985.3 whenever that county sought to obtain a personal injury plaintiff's medical records. Counties are but one of several state and local agencies listed in Government Code section 7465. Under the County's interpretation, cities and school districts would also be exempt from the definition of "subpoenaing party." (Gov. Code, § 7465, subd. (f); § 1985.3, subd. (a)(2).) We think that if the Legislature had intended such a large class of potential "subpoenaing parties" to be exempted from section 1985.3's procedural requirements, the legislative history would have contained some indication of that intent and some explanation for the exemption. It contains neither. Nor can we think of any reason why the Legislature might have wished to enact a statute containing a wholesale exemption for cities, counties, and other state and local agencies. A consumer's privacy interest in his or her personal records would still exist. (*Sehlmeyer* v. *Department of General Services* (1993) 17 Cal.App.4th 1072, 1077 [21 Cal.Rptr.2d 840].) If cities, counties, and other state and local agencies who were parties to "any civil action or proceeding pursuant to this code" (§ 1985.3, subd. (a)(3)) were to be exempted from the reach of section 1985.3, they would be without a statutorily prescribed procedural mechanism for obtaining personal records without violating the consumer's right to privacy. The consumer would be without a statutory procedural mechanism for enforcing his or her right to privacy. Such a void appears to be precisely what the statute was intended to fill.

In sum, we conclude the phrase "but shall not include the state or local agencies described in Section 7465 of the Government Code" in section 1985.3, subdivision (a)(3), should properly be read to mean "but shall not include the state or local agencies described in Section 7465 in proceedings governed by Government Code section 7460 et seq., the California Right to Financial Privacy Act." In the present case, the County's attempt to obtain the records pertaining to petitioner and maintained by Dr. Schmidt clearly was not governed by the California Right to Financial Privacy Act. We are here concerned with petitioner's medical records, not her bank account. The County was a "subpoenaing party" within the meaning of section 1985.3, subdivision (a)(3) and should have complied with the procedures prescribed by section 1985.3.

## II.

### PRIVACY

Article I, section 1 of the California Constitution provides that all people have certain inalienable rights, and among these are "pursuing and obtaining safety, happiness, and privacy." Numerous reported decisions have recognized that a patient has a privacy interest in a doctor's medical records pertaining to the patient's physical or mental condition. "The individual's right to privacy encompasses not only the state of his mind, but also his viscera, detailed complaints of physical ills, and their emotional overtones." (*Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669, 679 [156 Cal.Rptr. 55]; *Jones* v. *Superior Court* (1981) 119 Cal.App.3d 534, 549 [174 Cal.Rptr. 148].) "The state of a person's gastro-intestinal tract is as much entitled to privacy from unauthorized public or bureaucratic snooping as is that person's bank account, the contents of his library or his membership in the NAACP." (*Board of Medical Quality Assurance, supra,* 93 Cal.App.3d at p. 679; *Jones, supra,* at p. 549.) A patient "has a constitutionally protected interest in information contained in his or her medical file. . . ." (*Cutter* v. *Brownbridge* (1986) 183 Cal.App.3d 836, 843 [228 Cal.Rptr. 545].) "[M]edical records are the type of information which is protected by the right of privacy . . . ." (*Binder* v. *Superior Court* (1987) 196 Cal.App.3d 893, 901 [242 Cal.Rptr. 231].) "The zone of privacy created by this provision extends to the details of a patient's medical history." (*Heda* v. *Superior Court* (1990) 225 Cal.App.3d 525, 527 [275 Cal.Rptr. 136]; see also *Heller* v. *Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 42-44 [32 Cal.Rptr.2d 200, 876 P.2d 999]; *Palay* v. *Superior Court* (1993) 18 Cal.App.4th 919, 931-934 [22 Cal.Rptr.2d 839]; and *Davis* v. *Superior Court* (1992) 7 Cal.App.4th 1008, 1013-1014 [9 Cal.Rptr.2d 331].)

It is also well established that this zone of privacy "is not absolute." (*Cutter* v. *Brownbridge, supra,* 183 Cal.App.3d at p. 843; *Heda, supra,* 225 Cal.App.3d at p. 527; *Palay* v. *Superior Court, supra,* 18 Cal.App.4th at p. 933.) Section 2017, subdivision (a), provides in part that "[u]nless otherwise limited by order of the court in accordance with this article, any party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action . . . if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence." We have previously pointed out that when the constitutional right of privacy is involved, the party seeking discovery of private matter must do more than satisfy the section 2017 standard. The party seeking discovery must demonstrate a compelling need for discovery, and that compelling need must be so strong as to outweigh the

privacy right when these two competing interests are carefully balanced. In *Mendez* v. *Superior Court* (1988) 206 Cal.App.3d 557 [253 Cal.Rptr. 731], we stated at pages 566-567:

" 'In *Britt* v. *Superior Court* (1978) 20 Cal.3d 844. . . , we faced a similar conflict between discovery procedures and the parties' constitutional rights. . . .

" 'Responding to the assertion that the plaintiffs had waived their right to privacy by bringing suit, we stated that "while the filing of a lawsuit may implicitly bring about a partial waiver of one's constitutional right of associational privacy, the scope of such 'waiver' must be narrowly rather than expansively construed, so that plaintiffs will not be unduly deterred from instituting lawsuits by the fear of exposure of their private associational affiliations and activities." (*Id.* at p. 859.) Therefore, we noted, an implicit waiver of a party's constitutional rights *encompasses only discovery directly relevant to the plaintiff's claim and essential to the fair resolution of the lawsuit.* [Citations.]' (*Vinson* v. *Superior Court, supra,* 43 Cal.3d at p. 842, italics added.)

"Where discovery involves matters encompassed by the right to privacy, courts recognize that 'judicial discovery orders inevitably involve *state-compelled* disclosure . . . .' (*Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 856, fn. 3 [143 Cal.Rptr. 695, 574 P.2d 766], italics in original.) Therefore, in reviewing a party's resistance to a discovery order, based on the claim that it entrenches upon a constitutional right, we treat the compelled disclosure as a product of state action subject to constitutional constraints. (*Ibid.*)

" ' "The constitutional right of privacy is 'not absolute'; it may be abridged when, but only when, there is a 'compelling' and opposing state interest." . . . The following guidelines assist in determining when disclosure of private information may be compelled: "In an effort to reconcile these sometimes competing public values, it has been adjudged that inquiry into one's private affairs will *not* be constitutionally justified simply because inadmissible, and irrelevant, matter sought to be discovered *might* lead to other, and relevant, evidence.["] [Citation.] ' "When compelled disclosure intrudes on constitutionally protected areas, it cannot be justified solely on the ground that it may lead to relevant information." ' [Citations.]

" ' "And even when discovery of private information is found directly relevant to the issues of ongoing litigation, it will not be automatically allowed; there must then be a 'careful balancing' of the 'compelling public need' for discovery against the 'fundamental right of privacy.' " ' " (*Binder* v.

*Superior Court* (1987) 196 Cal.App.3d 893, 900 [242 Cal.Rptr. 231], italics in original.)" (Fn. omitted.)

And as the court pointed out in *Wood* v. *Superior Court* (1985) 166 Cal.App.3d 1138 [212 Cal.Rptr. 811], if an intrusion on the right of privacy is deemed necessary under the circumstances of a particular case, any such intrusion should be the minimum intrusion necessary to achieve its objective.

"An impairment of an interest of constitutional dimension passes constitutional muster only if it is *necessary* to achieve the compelling interest. [Citations.] That means that the conflict between the competing values must be unavoidable, i.e., that it does not arise from the choice of means by which to secure the compelling interest. It can readily be seen that if the conflict is avoidable but is not avoided the real conflict is not between the compelling interest and the constitutional interest but between the *means* chosen to achieve the compelling interest and the constitutional interest. Thus, a logical corollary of the compelling interest doctrine is the alternatives test. It requires a reordering of the values to be placed on the constitutional scales. If an alternative means of securing the compelling interest can be devised by which to avoid or minimize the conflict between the values protected by the constitution and the values found to be of compelling interest, that must be done. [Citation.] This results in a prohibition, among other things, of overbroad means of enforcement. It requires that the state utilize the 'least intrusive' means to satisfy its interest. [Citation.] Mere convenience of means or cost will not satisfy that test for that would make expediency and not the compelling interest the overriding value. [Citations.]" (*Wood* v. *Superior Court, supra,* 166 Cal.App.3d at p. 1148; see also *Palay* v. *Superior Court, supra,* 18 Cal.App.4th at p. 934.)

In the present case, as we have previously pointed out, petitioner testified at her deposition she was humiliated because "Youngblood knew that I had had a mastectomy, and I thought it was pretty insensitive for him to be talking about holding my big tits." Prior to the filing of the action, petitioner's administrative claim included a written description of her alleged harassment which included the following:

"Youngblood sometimes made comments about my breasts. I ignored him in hopes that he would get the message. He didn't. I'm sensitive about my breasts. I had a double, partial mastectomy and reconstructive surgery because of fibro-cystic disease. As you can imagine, this surgery had a major emotional impact on me. To have attention drawn to my breasts is not only disrespectful and embarrassing, I have the additional feeling that it is

intended to humiliate me. Maybe that isn't the case but I can't help but feel that way.

"He knew about the surgery. In fact his wife came over to visit and offer assistance during my recuperation. One time I responded to his comment by asking him if he had forgotten about my surgery."

Petitioner's declaration submitted in support of her motion for a protective order stated in part:

"2. On June 18, 1993, defendants conducted the third session of my deposition in this case. During the course of my deposition, James Thebeau, the Deputy County Counsel, asked me several questions concerning surgery that I underwent over six years ago and for which I was off work for approximately a four month period of recuperation. My mother, my grandmother, all but one of my mother's four sisters and my sister all suffer from the same condition. To date, except for my sister and me, for all of the other women in my family for two generations, with one possible exception, this condition has ultimately progressed into breast cancer.

"3. At my deposition, the initial questions were rather general and, I believed, concerned an earlier discussion about pain related to a physical examination for my Worker's Compensation claim. At that time, I stated that during the examination I felt pain that caused me to discover a new lump in my armpit. When it became apparent to me that Mr. Thebeau was questioning the reasons for my surgery and suggesting that somehow I had undergone nothing more than a cosmetic procedure, I indicated to my attorney that this line of inquiry was an invasion of my privacy. After the deposition, I realized that he must have obtained records from Dr. Gerhard Schmidt.

"4. I have sued the County and defendant Youngblood for sexual harassment. As part of that lawsuit, I have alleged that Donny Youngblood made explicit sexual propositions to me and repeatedly stared at and made extremely graphic comments about my breasts. I admit that I have said I believe he knew about my surgery and that I am sensitive about my breasts, but I believe my sensitivity is no different from that of the reasonable woman who has undergone similar surgery or that of any woman who has been graphically propositioned by her supervisor. I have claimed no physical injury to my breasts as a result of his conduct."

Petitioner's first amended complaint seeks to recover damages for her "mental suffering." Petitioner's motion nowhere expressly states that she does not intend to testify at trial that she had undergone a double partial mastectomy, that Youngblood knew about this surgery, and that Youngblood nevertheless made comments to her about her breasts. These alleged facts all

appear to be part of petitioner's explanation of how Youngblood's alleged conduct caused her to suffer humiliation and mental suffering.

Respondents characterize their need for Dr. Schmidt's records as follows: "Defendants contend that the plaintiff did not have 'preventative cancer surgery,' but an augmentation, that the alleged focus on her breasts is imagined or fabricated, that the plaintiff did not suffer feelings of hurt, shame and embarrassment because of the 'attention drawn to my breasts' or that if harassment in the form of comments about her breasts and 'leering and ogling' occurred, the plaintiff was not thereby actually offended or damaged. Certainly, if plaintiff is to be allowed to use statements about her breast surgery to buttress claims that she was harassed, actually offended and humiliated, defendants must be allowed to ask questions and ascertain the truth about those statements."

The superior court ruled there was "sufficient relevancy" to warrant discovery of the Schmidt records. We view the trial court's ruling as a determination that the records are "relevant to the subject matter of the litigation." (§ 2017.)[10] However, as we have explained, that is not a sufficient inquiry. The required balancing of petitioner's privacy interest against the stated need for the Schmidt records did not occur here. The superior court should conduct such a balancing. Even if we assume for purposes of argument that respondents are entitled to discover whether the surgical procedure was done for a cosmetic purpose or for some other purpose (an issue which this court need not and does not decide here), we deem it extremely unlikely that every document in the Schmidt file would need to be provided to the defense in order for the defense to discover Schmidt's characterization (as opposed to petitioner's characterization) of the surgery. (See also the discussion of in camera inspection in *Palay* v. *Superior Court*, *supra*, 18 Cal.App.4th at p. 935.) We need not speculate, however, on what the result of the court's balancing inquiry might be. That inquiry "was not performed in the first instance and . . . remains to be executed in accordance with law." (*People* v. *Superior Court* (*Thompson*) (1971) 16 Cal.App.3d 811, 819 [94 Cal.Rptr. 342], disapproved on other grounds in *People* v. *Superior Court* (*Stanley*) (1979) 24 Cal.3d 622, 627 [156 Cal.Rptr. 626, 596 P.2d 691].)

---

[10]We should perhaps mention that the superior court made no express finding that petitioner had waived her privacy right with respect to the Schmidt records, and that we do not view paragraph "3" of the court's ruling as a finding of waiver. "[W]aivers of constitutional rights are not lightly found." (*Heda* v. *Superior Court*, *supra*, 225 Cal.App.3d at p. 530.)

## III.

### DISPOSITION

Let a writ of mandate issue directing the superior court to vacate its order of November 17, 1993, denying petitioner's "Motion for Protective Order and Return of Improperly Subpoenaed Medical Records," and to conduct further proceedings not inconsistent with this opinion.

Except insofar as relief is granted hereinabove, the petition for writ of mandate is denied.

Dibiaso, J., and Cornell, J.,* concurred.

---

*Judge of the Merced Superior Court sitting under assignment by the Chairperson of the Judicial Council